UNITED STATES of America, Appellee,

v.

Robert JACKSON, William Scott and Martin Allen, Defendants-Appellants.

Nos. 838, 851, 852, Dockets 76–1564 to 76–1566.

United States Court of Appeals, Second Circuit.

Argued March 3, 1977.

Decided July 19, 1977.

Certiorari Denied Nov. 7, 1977.
See 98 S.Ct. 434.

Phylis Skloot Bamberger, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for appellant Jackson.

Henry J. Boitel, New York City, for appellant Scott.

Trevor L. F. Headley, Brooklyn, N. Y. (Headley & Zeitlin, Brooklyn, N.Y., of counsel), for appellant Allen.

Richard Appleby, Asst. U. S. Atty., Brooklyn, N.Y. (David G. Trager, U. S. Atty., E. D. N. Y., Alvin A. Schall, Asst. U. S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before LUMBARD and OAKES, Circuit Judges, and BRYAN, Senior District Judge.*

FREDERICK van PELT BRYAN, Senior District Judge:

Robert Jackson, William Scott, and Martin Allen appeal from judgments of conviction entered on November 23, 1976 in the United States District Court for the Eastern District of New York after a trial before Chief Judge Jacob Mishler without a jury.

Count one of the indictment alleged that between June 11 and June 21, 1976 the appellants conspired to commit an armed robbery of the Manufacturers Hanover Trust branch located at 210 Flushing Avenue, Brooklyn, New York, in violation of 18 U.S.C. § 371. Counts two and three each charged appellants with an attempted robbery of the branch on June 14 and on June 21, 1976, respectively, in violation of 18 U.S.C. §§ 2113(a) and 2. Count four charged them with possession of two unregistered sawed-off shotguns on June 21, 1976, in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 2.

After a suppression hearing on July 23, 1976 and a one-day trial on August 30, 1976, Chief Judge Mishler filed a memorandum of decision finding each defendant guilty on all four counts.[1]

Appellants' principal contention is that the court below erred in finding them guilty on counts two and three. While they concede that the evidence supported the conspiracy convictions on count one, they assert that, as a matter of law, their conduct never crossed the elusive line which separates "mere preparation" from "attempt." This troublesome question was recently examined by this court in *United States v. Stallworth*, 543 F.2d 1038 (2d Cir. 1976), which set forth the applicable legal principles. For the reasons which follow,

---

* Frederick vP. Bryan, of the Southern District of New York, sitting by designation.

1. Jackson was sentenced to imprisonment for two years on count one, and was given a suspended sentence with concurrent three-year terms of probation, to commence at the end of the prison sentence, on each of the other counts. Scott was sentenced to imprisonment for five years on count one, and to seven years imprisonment on each of the remaining three counts, all sentences to run concurrently. Allen received a five-year term of imprisonment on count one, and terms of ten years on each of the remaining three counts, all sentences to run concurrently.

**114**

we affirm the convictions of all three appellants on all four counts.

## I.

The Government's evidence at trial consisted largely of the testimony of Vanessa Hodges, an unindicted co-conspirator, and of various FBI agents who surveilled the Manufacturers Hanover branch on June 21, 1976. Since the facts are of critical importance in any attempt case, *United States v. Stallworth, supra,* at 1039, we shall review the Government's proof in considerable detail.[2]

On June 11, 1976, Vanessa Hodges was introduced to appellant Martin Allen by Pia Longhorne, another unindicted co-conspirator. Hodges wanted to meet someone who would help her carry out a plan to rob the Manufacturers Hanover branch located at 210 Flushing Avenue in Brooklyn, and she invited Allen to join her. Hodges proposed that the bank be robbed the next Monday, June 14th, at about 7:30 A. M. She hoped that they could enter with the bank manager at that time, grab the weekend deposits, and leave. Allen agreed to rob the bank with Hodges, and told her he had access to a car, two sawed-off shotguns, and a .38 caliber revolver.

The following Monday, June 14, Allen arrived at Longhorne's house about 7:30 A. M. in a car driven by appellant Robert Jackson. A suitcase in the back seat of the car contained a sawed-off shotgun, shells, materials intended as masks, and handcuffs to bind the bank manager. While Allen picked up Hodges at Longhorne's, Jackson filled the car with gas. The trio then left for the bank.

When they arrived, it was almost 8:00 A. M. It was thus too late to effect the first step of the plan, *viz.,* entering the bank as the manager opened the door. They rode around for a while longer, and then went to a restaurant to get something to eat and

discuss their next move. After eating, the trio drove back to the bank. Allen and Hodges left the car and walked over to the bank. They peered in and saw the bulky weekend deposits, but decided it was too risky to rob the bank without an extra man.

Consequently, Jackson, Hodges, and Allen drove to Coney Island in search of another accomplice. In front of a housing project on 33rd Street they found appellant William Scott, who promptly joined the team. Allen added to the arsenal another sawed-off shotgun obtained from one of the buildings in the project, and the group drove back to the bank.

When they arrived again, Allen entered the bank to check the location of any surveillance cameras, while Jackson placed a piece of cardboard with a false license number over the authentic license plate of the car.[3] Allen reported back that a single surveillance camera was over the entrance door. After further discussion, Scott left the car and entered the bank. He came back and informed the group that the tellers were separating the weekend deposits and that a number of patrons were now in the bank. Hodges then suggested that they drop the plans for the robbery that day, and reschedule it for the following Monday, June 21. Accordingly, they left the vicinity of the bank and returned to Coney Island where, before splitting up, they purchased a pair of stockings for Hodges to wear over her head as a disguise and pairs of gloves for Hodges, Scott, and Allen to don before entering the bank.

Hodges was arrested on Friday, June 18, 1976 on an unrelated bank robbery charge, and immediately began cooperating with the Government. After relating the events on June 14, she told FBI agents that a robbery of the Manufacturers branch at 210 Flushing Avenue was now scheduled for the following Monday, June 21. The three black male robbers, according to Hodges,

**2.** None of the appellants took the stand or offered any other evidence.

**3.** Hodges' testimony indicates that, in order to avert suspicion, Jackson would first lift the

trunk or hood of the car as though he were working under it before covering or uncovering the genuine license plates.

would be heavily armed with hand and shoulder weapons and expected to use a brown four-door sedan equipped with a cardboard license plate as the getaway car. She told the agents that Jackson, who would drive the car, was light-skinned with a moustache and a cut on his lip, and she described Allen as short, dark-skinned with facial hair, and Scott as 5' 9", slim build, with an afro hair style and some sort of defect in his right eye.

At the request of the agents, Hodges called Allen on Saturday, June 19, and asked if he were still planning to do the job. He said that he was ready. On Sunday she called him again. This time Allen said that he was not going to rob the bank that Monday because he had learned that Hodges had been arrested and he feared that federal agents might be watching. Hodges nevertheless advised the agents that she thought the robbery might still take place as planned with the three men proceeding without her.

At about 7:00 A. M. on Monday, June 21, 1976, some ten FBI agents took various surveilling positions in the area of the bank. At about 7:39 A. M. the agents observed a brown four-door Lincoln, with a New York license plate on the front and a cardboard facsimile of a license plate on the rear, moving in an easterly direction on Flushing Avenue past the bank, which was located on the southeast corner of Flushing and Washington Avenues. The front seat of the Lincoln was occupied by a black male driver and a black male passenger with mutton-chop sideburns. The Lincoln circled the block and came to a stop at a fire hydrant situated at the side of the bank facing Washington Avenue, a short distance south of the corner of Flushing and Washington.

A third black male, who appeared to have an eye deformity, got out of the passenger side rear door of the Lincoln, walked to the corner of Flushing and Washington, and stood on the sidewalk in the vicinity of the bank's entrance. He then walked south on Washington Avenue, only to return a short time later with a container of coffee in his hand. He stood again on the corner of Washington and Flushing in front of the bank, drinking the coffee and looking around, before returning to the parked Lincoln.

The Lincoln pulled out, made a left turn onto Flushing, and proceeded in a westerly direction for one block to Waverly Avenue. It stopped, made a U-turn, and parked on the south side of Flushing between Waverly and Washington—a spot on the same side of the street as the bank entrance but separated from it by Washington Avenue. After remaining parked in this position for approximately five minutes, it pulled out and cruised east on Flushing past the bank again. The Lincoln then made a right onto Grand Avenue, the third street east of the bank, and headed south. It stopped halfway down the block, midway between Flushing and Park Avenues, and remained there for several minutes. During this time Jackson was seen working in the front of the car, which had its hood up.

The Lincoln was next sighted several minutes later in the same position it had previously occupied on the south side of Flushing Avenue between Waverly and Washington. The front license plate was now missing. The vehicle remained parked there for close to thirty minutes. Finally, it began moving east on Flushing Avenue once more, in the direction of the bank.

At some point near the bank as they passed down Flushing Avenue, the appellants detected the presence of the surveillance agents. The Lincoln accelerated down Flushing Avenue and turned south on Grand Avenue again. It was overtaken by FBI agents who ordered the appellants out of the car and arrested them. The agents then observed a black and red plaid suitcase in the rear of the car. The zipper of the suitcase was partially open and exposed two loaded sawed-off shotguns,[4] a toy nickel-plated revolver, a pair of handcuffs, and masks. A New York license plate was seen lying on the front floor of the car. All of these items were seized.

4.  One of the shotguns proved to be inoperative.

In his memorandum of decision, Chief Judge Mishler concluded that the evidence against Jackson, Scott, and Allen was "overwhelming" on counts one and four. In contrast, he characterized the question of whether the defendants had attempted a bank robbery as charged in counts two and three or were merely engaged in preparations as "a close one." After canvassing the authorities on what this court one month later called a "perplexing problem," *United States v. Stallworth, supra,* at 1039, Chief Judge Mishler applied the following two-tiered inquiry formulated in *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975):

> First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.
>
> . . .
>
> Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.

He concluded that on June 14 and again on June 21, the defendants took substantial steps, strongly corroborative of the firmness of their criminal intent, toward commission of the crime of bank robbery and found the defendants guilty on each of the two attempt counts. These appeals followed.

## II.

"[T]here is no comprehensive statutory definition of attempt in federal law." *United States v. Heng Awkak Roman,* 356 F.Supp. 434, 437 (S.D.N.Y.), *aff'd,* 484 F.2d 1271 (2d Cir. 1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974). Fed.R.Crim.P. 31(c), however, provides in pertinent part that a defendant may be found guilty of "an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." 18 U.S.C. § 2113(a)[5] specifically makes attempted bank robbery an offense.

Appellant Scott argues that the very wording of 18 U.S.C. § 2113(a) precludes a finding that the actions charged in counts two and three reached the level of attempts. Relying on *United States v. Baker,* 129 F.Supp. 684 (S.D.Cal.1955), he contends that since the statute only mentions attempted taking and not attempted force, violence, or intimidation, it clearly contemplates that *actual* use of force, violence, or intimidation must precede an attempted taking in order to make out the offense of attempted bank robbery.

The *Stallworth* court faced a similar statutory construction argument which also relied heavily on *United States v. Baker, supra.* In response to the assertion that the defendants in that case could not be convicted of attempted bank robbery because they neither entered the bank nor brandished weapons, Chief Judge Kaufman stated:

> We reject this wooden logic. Attempt is a subtle concept that requires a rational and logically sound definition, one that enables society to punish malefactors who have unequivocally set out upon a criminal course without requiring law enforcement officers to delay until innocent bystanders are imperiled.

[5]. The subsection provides:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
>
> Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States or any larceny—
>
> Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

543 F.2d at 1040. We conclude that Scott's argument is foreclosed by this *Stallworth* holding, with which we are in entire accord.

Appellants Jackson and Allen, however, seek to distinguish the instant case from *Stallworth*. They claim that while the conduct of the defendants in that case could properly support a finding of attempted bank robbery, this is not true in the case at bar.

In *Stallworth*, the Government provided Rodney Campbell, an informant who had participated in numerous bank robberies, with an undercover vehicle outfitted with a tape recorder and monitoring equipment on the understanding that he would aid in apprehending his former accomplices. Campbell rejoined his companions, and he transported the group in his undercover vehicle as they cased several banks in Queens.

On Wednesday, January 21, they began actual preparations for a robbery by stealing ski masks from a department store, surgical gloves from a hospital, and purchasing a hacksaw and roofing nails to "fix" a shotgun. On Thursday, January 22, the gang selected a target bank in Whitestone, had one member enter it and report on its physical layout, and scheduled the robbery for Friday morning.

On Friday morning, January 23, Campbell and company assembled with a revolver, sawed-off shotgun, and other paraphernalia for a hold-up. On their way to the bank in the undercover vehicle they covered their fingers with bandaids, their hands with the surgical gloves, and put on the ski masks. Gasoline-soaked newspapers were placed under the seats of the car in preparation for its destruction after the getaway.

The car entered the parking lot of the shopping center in which the bank was located and one Sellers got out. He strolled past the bank several times, peeking in at each opportunity, while the car circled the shopping center. Finally, the vehicle pulled up directly in front of the bank and Sellers, armed with the sawed-off shotgun and positioned at an adjacent liquor store, started to approach the bank. Campbell said "let's go," and the occupants of the car reached for the doors. Immediately, FBI agents and New York City policemen who had staked out the parking lot and were monitoring the gang's conversations moved in and arrested the men.

Chief Judge Kaufman, writing for the court, selected the two-tiered inquiry of *United States v. Mandujano*,[6] *supra*, "properly derived from the writings of many distinguished jurists,"[7] 543 F.2d at 1040, as stating the proper test for determining whether the foregoing conduct constituted an attempt. He observed that this analysis "conforms closely to the sensible definition of an attempt proffered by the American Law Institute's Model Penal Code." *Id.* That definition, Model Penal Code § 5.01 (Proposed Official Draft 1962), provides:

*Criminal Attempt*

(1) Definition of Attempt. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b) when causing a particular result is an element of the crime, does or omits

---

6. The *Mandujano* test was paraphrased as follows:

   Initially, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime he is charged with attempting. Then, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime, conduct strongly corroborative of the firmness of the defendant's criminal intent.

   543 F.2d at 1040.

7. Among the leading attempt cases surveyed in Judge Rives' scholarly *Mandujano* opinion were *United States v. Quincy*, 31 U.S. (6 Pet.) 445, 8 L.Ed. 458 (1832); *Commonwealth v. Peaslee*, 177 Mass. 267, 59 N.E. 55 (1901) (Holmes, *J.*); *People v. Werblow*, 241 N.Y. 55, 148 N.E. 786 (1925) (Cardozo, *J.*); *People v. Rizzo*, 246 N.Y. 334, 158 N.E. 888 (1927); and *United States v. Coplon*, 185 F.2d 629 (2d Cir. 1950), *cert. denied*, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952) (L. Hand, *J.*).

to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or

(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

(2) Conduct Which May Be Held Substantial Step Under Subsection (1)(c). Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

(3) Conduct Designed to Aid Another in Commission of a Crime. A person who engages in conduct designed to aid another to commit a crime which would establish his complicity under Section 2.06 if the crime were committed by such other person, is guilty of an attempt to commit the crime, although the crime is not attempted by such other person.

(4) Renunciation of Criminal Purpose. When the actor's conduct would otherwise constitute an attempt under Subsection (1)(b) or (1)(c) of this Section, it is an affirmative defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose. The establishment of such defense does not, however, affect the liability of an accomplice who did not join in such abandonment or prevention.

Within the meaning of this Article, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim.

The draftsmen of the Model Penal Code recognized the difficulty of arriving at a general standard for distinguishing acts of preparation from acts constituting an attempt. They found general agreement that when an actor committed the "last proximate act," i. e., when he had done all that he believed necessary to effect a particular result which is an element of the offense, he committed an attempt. They also concluded, however, that while the last proximate act is *sufficient* to constitute an attempt, it is not *necessary* to such a finding. The problem then was to devise a standard more inclusive than one requiring the last proximate act before attempt liability

would attach, but less inclusive than one which would make every act done with the intent to commit a crime criminal. *See* Model Penal Code § 5.01, Comment at 38–39 (Tent. Draft No. 10, 1960).

The draftsmen considered and rejected the following approaches to distinguishing preparation from attempt, later summarized in *Mandujano* :

(a) The physical proximity doctrine—the overt act required for an attempt must be proximate to the completed crime, or directly tending toward the completion of the crime, or must amount to the commencement of the consummation.

(b) The dangerous proximity doctrine—a test given impetus by Mr. Justice Holmes whereby the greater the gravity and probability of the offense, and the nearer the act to the crime, the stronger is the case for calling the act an attempt.

(c) The indispensable element test—a variation of the proximity tests which emphasizes any indispensable aspect of the criminal endeavor over which the actor has not yet acquired control.

(d) The probable desistance test—the conduct constitutes an attempt if, in the ordinary and natural course of events, without interruption from an outside source, it will result in the crime intended.

(e) The abnormal step approach—an attempt is a step toward crime which goes beyond the point where the normal citizen would think better of his conduct and desist.

(f) The res ipsa loquitur or unequivocality test—an attempt is committed when the actor's conduct manifests an intent to commit a crime.

499 F.2d at 373 n. 5.

The formulation upon which the draftsmen ultimately agreed required, in addition to criminal purpose, that an act be a substantial step in a course of conduct designed to accomplish a criminal result, and that it be strongly corroborative of criminal purpose in order for it to constitute such a substantial step. The following differences between this test and previous approaches to the preparation-attempt problem were noted:

First, this formulation shifts the emphasis from what remains to be done—the chief concern of the proximity tests—to what the actor *has already done.* The fact that further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial. It is expected, in the normal case, that this approach will broaden the scope of attempt liability.

Second, although it is intended that the requirement of a substantial step will result in the imposition of attempt liability only in those instances in which some firmness of criminal purpose is shown, no finding is required as to whether the actor would probably have desisted prior to completing the crime. Potentially the probable desistance test could reach very early steps toward crime—depending upon how one assesses the probabilities of desistance—but since in practice this test follows closely the proximity approaches, rejection of probable desistance will not narrow the scope of attempt liability.

Finally, the requirement of proving a substantial step generally will prove less of a hurdle for the prosecution than the *res ipsa loquitur* approach, which requires that the actor's conduct must itself manifest the criminal purpose. The difference will be illustrated in connection with the present section's requirement of corroboration. Here it should be noted that, in the present formulation, the two purposes to be served by the *res ipsa loquitur* test are, to a large extent, treated separately. Firmness of criminal purpose is intended to be shown by requiring a substantial step, while problems of proof are dealt with by the requirement of corroboration (although, under the reasoning previously expressed, the latter will also tend to establish firmness of purpose).

Model Penal Code § 5.01, Comment at 47 (Tent. Draft No. 10, 1960).

The draftsmen concluded that, in addition to assuring firmness of criminal design, the requirement of a substantial step would preclude attempt liability, with its accompanying harsh penalties, for relatively remote preparatory acts. At the same time, however, by not requiring a "last proximate act" or one of its various analogues it would permit the apprehension of dangerous persons at an earlier stage than the other approaches without immunizing them from attempt liability. *Id.* at 47–48.

Applying the *Mandujano* test, which in turn was derived in large part from the Model Penal Code's standard, Chief Judge Kaufman concluded that since the *Stallworth* appellants had intended to execute a successful bank robbery and took substantial steps in furtherance of their plan that strongly corroborated their criminal intent, their attempted bank robbery convictions were proper.

In the case at bar, Chief Judge Mishler anticipated the precise analysis which this Court adopted in the strikingly similar *Stallworth* case. He then found that on June 14 the appellants, already agreed upon a robbery plan, drove to the bank with loaded weapons. In order to carry the heavy weekend deposit sacks, they recruited another person. Cardboard was placed over the license, and the bank was entered and reconnoitered. Only then was the plan dropped for the moment and rescheduled for the following Monday. On that day, June 21, the defendants performed essentially the same acts. Since the cameras had already been located there was no need to enter the bank again, and since the appellants had arrived at the bank earlier, conditions were more favorable to their initial robbery plan than they had been on June 14. He concluded that on both occasions

these men were seriously dedicated to the commission of a crime, had passed beyond the stage of preparation, and would have assaulted the bank had they not been dissuaded by certain external factors, *viz.*, the breaking up of the weekend deposits and crowd of patrons in the bank on June 14 and the detection of the FBI surveillance on June 21.

■ We cannot say that these conclusions which Chief Judge Mishler reached as the trier of fact as to what the evidence before him established were erroneous. As in *Stallworth*, the criminal intent of the appellants was beyond dispute. The question remaining then is the substantiality of the steps taken on the dates in question, and how strongly this corroborates the firmness of their obvious criminal intent. This is a matter of degree. *See* Model Penal Code § 5.01, Comments at 47 (Tent. Draft No. 10, 1960).

■ On two separate occasions, appellants reconnoitered the place contemplated for the commission of the crime and possessed the paraphernalia to be employed in the commission of the crime—loaded sawed-off shotguns, extra shells, a toy revolver, handcuffs, and masks—which was specially designed for such unlawful use and which could serve no lawful purpose under the circumstances. Under the Model Penal Code formulation, *supra* at 117–118, approved by the *Stallworth* court, either type of conduct, standing alone, was sufficient as a matter of law to constitute a "substantial step" if it strongly corroborated their criminal purpose. Here both types of conduct coincided on both June 14 and June 21, along with numerous other elements strongly corroborative of the firmness of appellants' criminal intent.[8] The

---

8. After securing the extra man they needed on June 14, the gang returned to the bank with their weapons ready and the car's license plate disguised for the getaway. Hodges' testimony was that they were ready to rob the bank at that time, but eventually postponed the robbery because conditions did not seem favorable. The fact that they then made further preparations by buying the stockings and gloves, an afterthought according to Hodges,

does not undercut the firmness of their criminal intent when they were at the bank on June 14. By only postponing execution of the plan, appellants did not renounce their criminal purpose, *see supra* at 118, but reaffirmed it. They reflected further upon the plan and embellished it by acquiring the stockings and gloves.

The actions of the appellants on June 21 might not support a finding, as in *Stallworth*,

steps taken toward a successful bank robbery thus were not "insubstantial" as a matter of law, and Chief Judge Mishler found them "substantial" as a matter of fact. We are unwilling to substitute our assessment of the evidence for his, and thus affirm the convictions for attempted bank robbery on counts two and three.[9]

Two other points raised by appellants merit only brief discussion.

■■■ Appellant Allen contends that, since the FBI agents relied upon information supplied by Vanessa Hodges, an informant of untested reliability, there was no probable cause for the arrests on June 21 and the fruits of the search of the Lincoln should have been suppressed. Recent decisions of this court make it clear, however, that there is no need to show past reliability when the informant, like Vanessa Hodges, is in fact a participant in the very crime at issue. *United States v. Miley*, 513 F.2d 1191, 1204 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975); *United States v. Rueda*, 549 F.2d 865 (2d Cir. 1977); *United States v. De Stefano*, 555 F.2d 1094 (2d Cir., decided May 16, 1977). In this case, moreover, the detailed corroboration of the innocent elements of Hodges' tip by the agent's observations on June 21 supplied ample proof of her reliability, independent of that arising from her status as a confessed accomplice. *See United States v. Sultan*, 463 F.2d 1066, 1068–69 (2d Cir.

1972); *United States v. Gonzalez*, 555 F.2d 308 (2d Cir. 1977).

■■■ Appellant Scott argues that since there was no evidence showing that he owned, actually possessed, exercised dominion over, or even touched the two sawed-off shotguns seized from the Lincoln, he was erroneously convicted on count 4, charging him with a violation of 26 U.S.C. § 5861(d).[10] This claim overlooks the fact, however, that count 4 of the indictment also alleged a violation of 18 U.S.C. § 2, and the evidence plainly establishes that, at the very least, Scott was an aider and abettor of the unregistered possession of the firearms. *See United States v. Holt*, 427 F.2d 1114, 1117 (8th Cir. 1970). Alternatively, Scott's conviction on count 4 can be upheld on the theory of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). *See United States v. MacDougal-Pena*, 545 F.2d 833, 835 (2d Cir. 1976).

The judgments of conviction are affirmed.

---

that "a bank robbery was in progress." 543 F.2d at 1041. Such a finding, however, is not essential to attempt liability, *see supra* at 117–118, which is designed to "encourage[e] early police intervention where a suspect is clearly bent on the commission of crime." *United States v. Stallworth, supra*, at 1041. On June 21, the firmness of appellants' criminal intent was again evident. The very fact that they showed up at the bank that day after discovering that the agents had arrested Hodges suggests that they were determined to execute their plan. Moreover, they once again had the necessary weapons, the car prepared for escape, and gave every indication that they were ready to strike.

9. Since Chief Judge Mishler was justified on the facts of this case in construing the June 14 and June 21 attempts as distinct criminal transactions or episodes, rather than simultaneous violations, the concurrent sentences on counts

two and three were not improper. *Contrast, e. g., Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957); *United States v. Mariani*, 539 F.2d 915 (2d Cir. 1976); *Gorman v. United States*, 456 F.2d 1258 (2d Cir. 1972). We feel impelled here, however, to remind the Government that it may face valid double jeopardy claims if it tries to fragment what is in fact a single crime into its components and punish each separately. *See Brown v. Ohio*, —— U.S. ——, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), and cases there cited.

10. 26 U.S.C. § 5861 provides in pertinent part: It shall be unlawful for any person—

. . . . .

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record