**UNITED STATES of America, Appellee,**

v.

**David MANLEY and Fluer Williams, Appellants.**

**Nos. 971, 996, Dockets 79–1428, 79–1454.**

United States Court of Appeals, Second Circuit.

Argued April 25, 1980.

Decided Sept. 15, 1980.

Stanley Schimmel, Brooklyn, N. Y., for appellant Manley.

Barry Turner, New York City, for appellant Williams.

David V. Kirby, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for the U. S.

Before WATERMAN, MESKILL and NEWMAN, Circuit Judges.

MESKILL, Circuit Judge:

Fluer Williams and David Manley appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York after a jury trial before Hon. George C. Pratt. Williams was adjudged guilty of possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and Manley guilty of attempting to commit that offense, in violation of 21 U.S.C. § 846. Numerous claims of error are raised by appellants, the most hotly contested of which concerns the propriety of the entry made by agents of the Drug Enforcement Administration into Williams' home in order to execute an arrest warrant for a fugitive whom they erroneously believed to be on the premises. Appellants also complain of certain evidentiary rulings made in the course of the suppression hearing. In addition, Manley, arrested in Williams' home following the entry of the agents, assails the sufficiency of the evidence upon which his conviction for attempted possession of narcotics is based. For the reasons which follow, we deem these claims as well as others advanced by appellants to be without merit

and accordingly affirm the judgments of conviction.

## I.

Pursuant to a lengthy suppression hearing, the district court expressly found, or the uncontradicted testimony established, the following. In early 1978, one Danny Warren, whose true name was Donald Grant and who used a number of aliases including Danny Williams as well as the more colorful nicknames "Champagne Danny" and "Rolls–Royce Danny," was indicted in the United States District Court for the Southern District of New York for drug trafficking. Warren failed to surrender and consequently, in April of 1978, a warrant was issued for his arrest. The DEA investigation had revealed that Warren maintained two Manhattan residences, but that significant activities concerning his narcotics operations occurred on Long Island. The fugitive was described in DEA files as a black male of West Indian or Jamaican origin, approximately 6'0" tall, of medium build and in his mid or late forties. Additionally, according to information credited by the DEA, Warren was of a violent disposition, and was likely to be armed.

Attempts to apprehend Warren were futile during 1978, but in January, 1979, DEA agent Raymond Kobyra, who had participated in the grand jury investigation but had never actually seen Warren, received information from a reliable out–of–state informant that Warren had been seen in the United States the preceding month, that he made occasional trips to the New York area and that his Rolls Royce was frequently taken for repairs or servicing to Haug Motors, a Manhattan foreign car dealership. Armed with at least two photographs of the fugitive, including one obtained from a woman believed by Kobyra to be Warren's mother, Agent Kobyra on April 12 paid a visit to Haug Motors where one of the employees identified Warren as a recent customer whose Rolls Royce was serviced at the shop. A check of Haug Motors' records revealed that the individual presented himself there as one Williams, that he owned a black and tan Rolls Royce bearing Washington, D.C. license plates, and that he listed his home address as 191 Berry Hill Court, West Hempstead, Long Island. A further check of the license plate number indicated that the automobile was registered to a female named Williams or Williamson who listed a home address in an impoverished section of Washington, D.C.

That afternoon, Agent Kobyra proceeded to the vicinity of 191 Berry Hill Court, where he questioned a number of persons. Two neighbors, without prompting, recognized Warren's photograph as portraying the occupant of the nearby one–family dwelling at No. 191. They described that individual as a black male of Jamaican origin, in his mid–forties, approximately 5'8" to 5'10" in height, and of medium build. They stated that their neighbor maintained a lavish lifestyle, kept irregular hours, was often away for extended periods of time, and drove a Rolls Royce.

Later that night, at approximately 10:00 p. m., in accordance with Agent Kobyra's earlier request, one of these neighbors telephoned Agent Kobyra and stated that the occupant of 191 Berry Hill Court had arrived at his home. After summoning a number of other DEA agents for assistance for executing the warrant, Agent Kobyra, accompanied by Agent Shea, drove past the suspect's home at about midnight and observed a black male gazing out a picture window. After they parked the car somewhat beyond No. 191, the agents noticed that this individual had opened the front door and was lingering just outside the entranceway.

After radioing instructions to two other agents to position themselves at the rear of the house, Agents Kobyra and Shea quickly approached the figure on the landing above them, identified themselves as law enforcement officers, and asked to speak with him. The individual thereupon beat a hasty retreat to the interior of the home, locking the door behind him. On reaching the front landing, Agent Kobyra perceived either through the glass of the front door or through an adjacent window, a second black

male, dressed in a burgundy colored shirt, darting from the kitchen, located in the rear of the house, towards other rooms. One or both of the agents had by this time drawn their revolvers, and by brandishing them induced the individual they had initially observed to open the front door.

After having gained entry, Agent Shea, who like Kobyra had participated in the investigation of Warren but had never actually seen him, immediately placed the individual face down, in a prone position, and handcuffed him. The party apprehended was not in fact Warren but appellant Williams, who is described as over 6'0" tall, of medium build, and 23 years of age. Agent Shea also placed in custody one Deborah Robinson, Manley's sister-in-law, who was standing in full view upon an elevated landing inside the house when the agents burst in.

Apparently no conversation between Agents Kobyra or Shea and Williams took place at this juncture, and the state of mind of the agents upon confronting appellant is not entirely clear. Agent Kobyra confirmed in his testimony that immediately after gaining forcible admittance to the house he exclaimed "Where's Warren?," thus intimating doubt that Williams was the party sought. During the hearing, however, the agent stated emphatically, and his testimony was credited by the district judge, that given the strength of his belief that Warren was on the premises, he was not prepared to concede error until the house had been searched for the fugitive and Williams had established his identity as someone other than Warren through some authoritative method such as fingerprinting.

Detailed reflection was impossible in any case at this stage since events were unfolding rapidly. Immediately after Williams had been subdued, Kobyra rushed through to the kitchen, located in the rear of the house, to admit Agents Papantoniou and Yaniello. Approximately 30 seconds to a minute had elapsed between the forced admittance through the front door and the entry of the back-up agents through the kitchen door. At this point, the agents observed in plain view on the kitchen table a triple beam scale, together with spoons and a strainer, and two mounds of a white, powdery substance, one resting upon the scale and the other on the table beside it.

The agents, aware of the presence of others in the house, and in accordance with standard operating procedure, conducted a security check of the premises. Agent Kobyra proceeded to the main bedroom where he encountered one Shirley Faggart, a companion of Williams, reclining on the bed. He searched the room, including its spacious closet, for other persons. Kobyra then left, but shortly thereafter returned with Agent Papantoniou, who discovered in plain view in the closet a small caliber revolver, and upon a dresser, again in plain sight, an additional packet of cocaine. Also pursuant to this security check, the agents inadvertently discovered two bags of marijuana in the hallway which had been placed under a glass-top table. At the same time, Agent Yaniello discovered Manley, apparently attempting to conceal himself in a small, unkempt bedroom. Manley was placed in custody in the same manner as Williams, that is, handcuffed while lying face down in a prone position.

Having secured the house, the agents assembled its various inhabitants in the living room and conducted a pat-down of appellants which yielded from Manley a wallet containing $2,222 in cash. Williams' wallet was recovered in the kitchen and was found to contain identification documents for three different persons. At about this time, a third black male, one John Harold, accompanied by a woman and a child, arrived at the house, looking for Williams. The three were detained and Harold was frisked and found to be carrying a gun.

After the suspects had been read their rights, and each had signified his understanding, the agents questioned them. Manley stated that he had come for a social visit, that he had no knowledge of the presence in the house of narcotics, and that he would not know what cocaine looked like in any event. He further claimed that the

money found on his person was the proceeds of his business, a food store located in Brooklyn. Williams, for his part, explained that the various identification documents found in his wallet were related to trouble he was having with the motor vehicle department over his license and stated that he too was unaware of the presence of narcotics on his premises. He noted that he had recently been visited by two women friends, whose names he could not recall, and that any contraband that might be found within the house was no doubt left by them.

Subsequently, the agents requested permission from Williams to conduct a full–scale search of the house to which the agents believed Williams assented on the condition that he could accompany them. During this purported consent search, Agent Kobyra discovered in the main bedroom a second handgun, several sacks of marijuana and two bottles of lactose, a commonly used dilutant of certain narcotics. Williams thereupon withdrew his consent to the search, which ceased. All detainees were then released save for Williams and Manley who were held for booking.

While en route to the Metropolitan Correctional Center, Williams stated to Agent Kobyra that the cocaine belonged to him and not to Manley. The following morning, Manley, while being transported to his arraignment in the Eastern District stated that the police had arrested the wrong person, implying that Harold was the intended purchaser of the narcotics found in Williams' house.

Appellants were subsequently named in a four count indictment which averred, in its first count, that they had conspired to possess the narcotics found in Williams' home with the intent to distribute them. The second count charged Williams with possession and the third charged Manley with attempted possession. The final count, which was not submitted to the jury and which was subsequently dismissed, charged Williams, a previously convicted felon, with illicit possession of a firearm. Appellants moved to suppress all evidence obtained as a result of the arrests and the searches of Williams' house, essentially on the grounds that probable cause did not exist to execute the arrest warrant in Williams' home, that the searches thereof were unauthorized and beyond the lawful scope of the arrests and that the statements made by appellants were involuntary.

Following an extensive hearing, the district court concluded that the agents, whose testimony was credited, had acted in good faith, that they possessed a sufficient basis to attempt to execute the warrant in Williams' home, that the limited security check of the premises ancillary to the arrests was proper, and that the statements made by appellants were voluntary. Judge Pratt concluded, however, that the government had not adequately demonstrated that Williams' consent to the search of his house was freely given, and consequently suppressed the evidence uncovered by that search, to wit, the second handgun, certain bags of marijuana, and the two bottles of lactose. Further, after an *in camera* examination by Judge Pratt of the two neighbors interviewed by the DEA on April 12, 1979, Judge Pratt held that Agent Kobyra's testimony concerning their pertinent statements and activities was fully substantiated, and the court consequently upheld the refusal of the United States Attorney to reveal their identities to defense counsel.

Trial commenced on September 6, 1979, and at the conclusion of the government's case, the court, upon motion, dismissed the conspiracy charge due to the failure of the government to establish any agreement or understanding between Manley and Williams. Subsequently, the jury returned verdicts adjudging Williams guilty of possession and Manley guilty of attempted possession of narcotics. Williams was later sentenced to six years' imprisonment to be followed by a six year term of special parole. Manley was sentenced to a three year term of imprisonment, which was suspended save for six months, to be followed by three years' special parole. The propriety of these sentences has not been challenged on this appeal.

## II.

Appellants contend that there existed insufficient justification for attempting to execute the arrest warrant at Williams' home, and further assail the district court's refusal to order disclosure of the identities of the two neighbors who had identified Williams from Warren's photograph on the ground that their inability to examine the neighbors prejudiced their ability to demonstrate the agents' lack of reasonable belief that the fugitive was on the premises of 191 Berry Hill Court. Further, the propriety of the initial search made following the forcible entry of the agents is challenged, and the introduction at trial of evidence seized pursuant to that search is assigned as error. Finally, Manley argues that his arrest was without probable cause, that its fruits, including the money found on his person and his inculpatory statements, should have been suppressed, and that in any event, the proof was insufficient to support his conviction for attempted possession of narcotics. These assertions are considered in turn.

### A. Reasonable Belief or Probable Cause for the Execution of the Arrest Warrant.

Citing what appears to them as laxity in the investigative work which led the agents to 191 Berry Hill Court, appellants argue, in essence, that there existed insufficient probable cause to believe that the fugitive was to be found within. They note that four months elapsed between receipt of the original, purportedly reliable information from the confidential informant concerning Warren's patronage of Haug Motors and Agent Kobyra's appearance there. Appellants further note that the investigators never procured an accurate physical description of their quarry, although this information was available from their own files or those of other law enforcement organizations, and argue that had an accurate description been obtained, the agents would have instantly realized their mistake when they first confronted Williams. Moreover, they charge that the agents could not have reasonably relied upon the recognition of Warren's photograph by the two neighbors

since those individuals had had little or no contact with the occupant of No. 191 and were unable to discern distinguishing traits or features among blacks.

█ The law in this Circuit now holds that police may enter a dwelling to execute an arrest warrant for a person other than its owner or tenant where there exists "reasonable belief" that the party sought will be found therein. *United States v. Arboleda*, 633 F.2d 985, 990 n.6 (2d Cir. 1980) (Friendly, *J.*); *see also United States v. Cravero*, 545 F.2d 406, 421 (5th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977). It would appear that the "reasonable belief" standard, as it has been applied in this jurisdiction, may require less justification than the more familiar probable cause test. *But see United States v. Arboleda, supra*, 633 F.2d at 992 (Oakes, *J.*, dissenting); *United States v. Hammond*, 585 F.2d 26, 28 (2d Cir. 1978). In the instant case, of course, the agents believed they were entering the residence of the person for whom an arrest warrant had been issued. Putting aside, however, the question of whether for present purposes 191 Berry Hill Court could be deemed the residence of someone other than the fugitive such that the agents would be required to demonstrate some measure of certainty regarding the presence there of the party sought before attempting to execute the warrant within the house, we need not base our disposition of the issue on adherence to the "reasonable belief" standard as opposed to a probable cause standard. A cursory review of the relevant facts establishes that the agents had ample justification, well beyond that which would be required to satisfy the potentially more stringent probable cause standard, in concluding that the elusive Warren would be found within 191 Berry Hill Court. Warren was known to utilize the alias "Williams." An employee of a Manhattan car dealership had identified a photograph of Warren as a picture of a customer who owned a Rolls Royce, used the name Williams, and lived at 191 Berry Hill Court. Warren was reportedly in the United States, and was believed

to have previously directed criminal activities centered on Long Island. The confusion between Williams and Warren was understandably exacerbated by the fact that they had similar lifestyles, were both described as of Jamaican ancestry and had certain physical likenesses, albeit upon closer inspection, they were different in appearance. Perhaps most compelling, three citizens had made positive identifications of Williams as the fugitive being sought from the photograph of Warren displayed by Agent Kobyra, and one of the neighbors later called DEA headquarters to say that the individual was currently at home. *See United States v. Arboleda, supra,* 633 F.2d at 990 n.6. As the agents approached, appellant hastily retreated to the interior of his house where he briefly attempted to barricade himself. In light of the foregoing, the agents were fully justified in attempting to execute their arrest warrant. While appellant was, as it later developed, the victim of circumstance, those circumstances were no less real or compelling to the agents because they ultimately turned out to be remarkable coincidences. *Cf. Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971); *United States v. Rosario,* 543 F.2d 6, 8 (2d Cir. 1976).

■ Adoption of appellants' position would require that the execution of an arrest warrant on the premises of a third party, or at least in a residence whose right to occupancy was in question, be accompanied by something approaching a certainty of success. Such a position, of course, must be rejected. The Supreme Court long ago observed that "In dealing with probable cause . . . we deal with probabilities," *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the lead Agent Kobyra was following. As we recently noted in a factually different but theoretically analogous context,

> The essence of probable cause is a reasonable, objective basis for *belief* in a suspect's guilt, although not necessarily *proof* of guilt beyond a reasonable doubt.

\* \* \* \* \* \*

[W]hile the rule of probable cause does impose a requirement on police to act with more than mere suspicion of wrongdoing, the rule also gives police a permit to act with less than absolute certainty of guilt.

*United States v. Webb,* 623 F.2d 758, 761 (2d Cir. 1980) (emphasis in original).

Appellants' further assertion that the attempted execution of the warrant was attributable to the agents' desire to search an innocent person's home is equally without factual foundation. Arguably, Williams could have avoided the entry of the law enforcement officers into his home had he permitted them to question him as he lingered on his front landing. By fleeing to the interior of his home after the agents had announced their identities and intentions, Williams himself created an exigent circumstance which plainly justified the forcible entry into his home and the subsequent security check of the premises. *United States v. Gomez,* 633 F.2d 999, 1007–1008 (2d Cir. 1980); *United States v. Soyka,* 394 F.2d 443, 453–54 (2d Cir. 1968) (en banc, per Friendly, *J.*), *cert. denied,* 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 705 (1969).

Our review of the facts leads us to conclude that the agents, at a minimum, possessed probable cause to seek to execute the arrest warrant at 191 Berry Hill Court, and perforce, they had a "reasonable belief" in Warren's presence there. Indeed, given the resources and evasiveness of the fugitive, they would have been remiss in their duties had they not acted expeditiously on the information Agent Kobyra had developed.

### B. *Nondisclosure of the Identities of Informants.*

■ In assessing the agents' conduct, the district court did not err in refusing to compel the government to reveal the identities of the individuals who had mistakenly recognized the Warren photograph as portraying Williams. Appellants' counsel wished to examine these witnesses, particularly the two neighbors, to test Agent Ko-

byra's testimony regarding their statements, and to ascertain if they had a sufficient familiarity with the occupant of 191 Berry Hill Court to render reasonable the agents' reliance on their recognition of the Warren photograph.

 Appellants bear the burden of demonstrating entitlement to this information, *In re United States*, 565 F.2d 19, 23 (2d Cir. 1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978), a matter which lies within the sound discretion of the district court. *United States v. Hyatt*, 565 F.2d 229, 231 (2d Cir. 1977). There is no rule or precedent requiring the government to reveal to defendants the identities of persons supplying it with confidential information. Rather, as was held in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the trial judge must in each case weigh the interests of the defendant in obtaining such information against the government's desire to encourage the free flow of such information from its citizens. In striking these individualized balances, the Supreme Court has indicated that the most persuasive case for disclosure is where the examination of the informant is necessary to vindicate a defense on the merits and where the withholding of the information will thereby compromise the truth–finding function of the trial. Conversely, the Supreme Court has observed that the need for disclosure is far less compelling when it is sought in connection with pretrial issues, such as the propriety of search or seizure, which do not bear upon the ultimate question of guilt or innocence. *McCray v. Illinois*, 386 U.S. 300, 311–12, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967).

Noting the limitation placed upon *Roviaro* by *McCray*, this Court has taken the view that while disclosure is not absolutely precluded when sought in regard to a suppression hearing, it will be deemed appropriate only where the information supplied by such persons constitutes the "essence," "core" or "main bulk" of the probable cause upon which the authorities have relied, and where the critical information ascribed to these individuals is not in any significant manner corroborated by independent evidence. *United States v. Comissiong*, 429 F.2d 834, 838–39 (2d Cir. 1970).

It is readily apparent that Judge Pratt was, if anything, considerably more accommodating to appellants' demand than was necessary. The data provided by the informants in this case related solely to the issue of justification for attempting to execute the arrest warrant, a matter even more remote from a defense on the merits than the usual search and seizure controversy, and light years away from the question of actual guilt or innocence. Appellants sought to examine these informants not primarily to determine if they had in fact made the statements and supplied the information attributed to them, but principally to ascertain if their responses could reasonably have been considered reliable by law enforcement agents. One might well question whether, in light of *McCray*, disclosure of their identities could ever be properly compelled in such a· situation. In any event, appellants' access to this information was properly denied under the test enunciated in *United States v. Comissiong, supra*.

The government's concession to the contrary notwithstanding, it appears that there existed sufficient evidence independent of the three misidentifications of Warren's photograph to have established reasonable belief, if not probable cause, to think the fugitive would be found at 191 Berry Hill Court. For example, Warren was known to use the alias Williams, to drive a distinctive Rolls Royce which was serviced at a particular Manhattan dealership, and to make occasional, surreptitious trips to the New York metropolitan area where a grand jury had determined that he previously directed a narcotics operation which was centered on Long Island. Further inquiry revealed that the Rolls Royce thought to belong to Warren was falsely registered. The DEA agents observed from a distance a physical resemblance between Williams and their prey, and their suspicions were galvanized when, upon their approach, appellant fled into his house. Reasonable belief to execute an arrest warrant requires no more.

Even if the "essence," "core" or "main bulk" of the justification for execution of the warrant was derived from the citizen–informants, the independent evidence gathered by the agents as set forth above, was unquestionably adequate to corroborate the statements attributed by Agent Kobyra to those individuals and to render disclosure of their identities unnecessary under the second prong of the *Comissiong* test. For example, each gave a roughly accurate physical and ethnic description of the fugitive and each, without prompting, volunteered that Williams possessed a Rolls Royce.

Finally, Judge Pratt's *in camera* examination of the informants living near 191 Berry Hill Court completely vindicated Agent Kobyra's testimony, and thereby allayed any reasonable concern that these individuals lacked a basis for making the identification or that Agent Kobyra had misrepresented their statements or actions. Accordingly, there was no error in the district court's thoughtful resolution of this matter.

## C. Legality of the Search Pursuant to the Execution of the Arrest Warrant.

Appellants, on diametrically opposed grounds, challenge the legality of the limited search made pursuant to the execution of the arrest warrant. Williams presses the theory that the agents upon their entry into his home instantaneously realized their mistake, that further intrusion was consequently unwarranted and that the agents should have immediately and apologetically withdrawn. Manley, on the other hand, urges that the agents must have believed on entry that they had apprehended the fugitive, and with their mission accomplished, could not have lawfully rummaged through the house.

The conflict between appellants' contentions is enlightening, for it dramatically demonstrates that in all probability the agents did not reach any conclusion as to the success of their endeavor at the very moment they gained admission to Williams' home. Neither Agent Kobyra nor Agent Shea had ever seen Warren in person, and following their forcible entry, made under conditions which were reasonably perceived as dangerous, they did not engage Williams in a lengthy colloquy about his true identity, nor did Williams volunteer his name. On the contrary, Agent Kobyra almost immediately bolted to the rear of the house to admit the backup agents, and in the course of that activity observed cocaine and narcotics paraphernalia in plain view. Under the circumstances, there is every reason to credit Agent Kobyra's testimony, as Judge Pratt did, to the effect that it was only after completion of the initial search that he began to doubt that Williams was Warren, and even then was not prepared to concede his mistake until some dispositive procedure, such as fingerprinting, had verified Williams' true identity.

■ The agents' states of mind are irrelevant, however, for under either scenario posed by appellants, there is no doubt that they were entitled to conduct the limited, plain view search of the premises which Judge Pratt properly assumed to have been permissible. Accepting Williams' theory that the agents spontaneously realized their mistake, they were nonetheless entitled to look through the house given the strength of their justification in executing the warrant and their having glimpsed, prior to entry, a second black male darting across the upstairs landing, who might have reasonably been thought to be the elusive Warren. Accepting Manley's contention that the agents were initially confident that they had captured the fugitive inside the front door they were nevertheless entitled to make a "security check" of the premises, a practice which this Court has most recently approved in *United States v. Gomez, supra,* 633 F.2d at 1008, and *United States v. Agapito,* 620 F.2d 324, 335–37 (2d Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). *See also United States v. Christophe,* 470 F.2d 865, 869 (2d Cir. 1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973). Under these cases, agents effecting an arrest upon private premises who reason-

ably fear that other persons are lurking within who pose a threat to their safety or are likely to destroy evidence, may conduct a pass–through of the premises to determine the presence of any such persons. The conditions warranting this type of limited search were plainly present in the instant case because the agents were aware both before and immediately after entry of the presence of other people, and because Warren was presumed to be of a violent nature, likely to be armed, and possibly accompanied by criminal coconspirators. Accordingly, the arresting agents had abundant reason for securing the premises and the evidence in plain view discovered during the course of this procedure was properly admitted at trial. *United States v. Liberti*, 616 F.2d 34, 36–37 (2d Cir. 1980). Judge Pratt's delineation between the materials seized pursuant to this search and those uncovered during the impermissible "consent search" was carefully made and his rulings in that regard are not clearly erroneous.

D. *Sufficiency of the Evidence Supporting Manley's Conviction.*

Manley argues that the evidence was insufficient to support his conviction for attempted possession of narcotics with intent to distribute. Preliminarily, he contends that his arrest was unjustified and that the cash horde discovered on his person and his incriminating statements made pursuant to his arrest should have been suppressed. Further, he asserts that the jury could not have properly concluded that his behavior rose to the level of a criminal attempt to violate the narcotics law. We disagree.

■ There is no substance to Manley's initial argument since at the time he was detained the agents had probable cause to believe he had engaged in a criminal act. It will be recalled that his arrest came after the agents had spotted him running from a room in which a substantial quantity of cocaine and narcotics paraphernalia were in plain sight and some portion of that cocaine was in the process of being measured. Manley thereupon attempted to conceal himself from the agents. *Cf. United States v. Gomez, supra,* 633 F.2d at 1007. Under these circumstances, the agents were justified in placing him in custody. *United States v. Webb, supra,* 623 F.2d at 761–63. Consequently, the money found on his person and his subsequently uttered inculpatory statements were properly received at trial.

■ We also reject appellant's second contention, that his behavior fell short of an illicit attempt. There is no general federal statute proscribing attempt, and it is therefore actionable only where, as in the present case, a specific criminal statute makes impermissible its attempted as well as actual violation. *United States v. York,* 578 F.2d 1036, 1038 (5th Cir.), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682 (1978). This Court, along with the Fifth Circuit, has adopted the view set forth in Section 5.01 of the American Law Institute's Model Penal Code (Proposed Official Draft 1962), that the requisite elements of attempt are an intent to engage in criminal conduct and the performance of acts which constitute a "substantial step" towards the commission of the substantive offense. *United States v. Jackson,* 560 F.2d 112, 117–20 (2d Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977); *United States v. Stallworth,* 543 F.2d 1038, 1040 (2d Cir. 1976); *see also United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), *and see United States v. Alvarez,* 610 F.2d 1250, 1254 n.3 (5th Cir. 1980); *United States v. Oviedo,* 525 F.2d 881, 885–86 (5th Cir. 1976).

■ A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime, and thus the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime. *United States v. Jackson, supra,* 560 F.2d at 118–19. In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consumma-

tion of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute.

As we noted in *United States v. Busic*, 549 F.2d 252, 257 n.9 (2d Cir. 1977), "Judicial inquiry into whether a defendant is chargeable with an attempt is necessarily predictive and focuses on the point when the accused's conduct has progressed sufficiently to minimize the risk of an unfair conviction." A second useful formulation may be found in *United States v. Monholland*, 607 F.2d 1311, 1318 (10th Cir. 1979):

> The cases universally hold that mere intention to commit a specified crime does not amount to an attempt. It is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime.

Whether conduct represents a substantial step towards the fulfillment of a criminal design is a determination so dependent on the particular factual context of each case that, of necessity, there can be no litmus test to guide the reviewing courts. With respect to the case at bar, however, it is clear that the district judge properly submitted the matter to the trier of fact, and that the jury's verdict was supported by evidence amply demonstrating both essential elements of criminal attempt. There can be no doubt that the evidence warranted a finding that Manley possessed the requisite state of mind. The circumstances constituting the probable cause for his arrest have been noted above and plainly bespeak an evil intent. Additionally following his detention he was found to be carrying a large sum of money, roughly equivalent to the purchase price of the quantity of cocaine found on the scale. His explanations for his presence at Williams' home and for the extravagant amount of cash he was carrying were unpersuasive if not inherently improbable. Certain of his post–arrest statements could reasonably have been construed as falsely exculpatory while others might well be interpreted as admissions. Furthermore, he took the stand at trial and the jury was entitled not only to reject his testimony, but to draw adverse inferences from what could reasonably have been viewed as a fabrication. *United States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

A somewhat more difficult question arises with respect to the second essential element of intent, namely, the proximity of Manley's conduct to the accomplishment of the crime. In essence, Manley is being punished for intending to purchase narcotics, and in furtherance of that design, carrying to Williams' home a sufficient amount of cash to consummate the transaction and participating in the weighing of the contraband. There is no challenge to the court's instruction on this facet of attempt, and Judge Pratt properly charged the jury that in order to find Manley guilty, his conduct, objectively evaluated, must have been a "substantial step" towards the acquisition of narcotics. The issue posed on appeal is simply whether Manley's actions as described above can, as a matter of law, be viewed as having crossed the frequently imperceptible boundary from preparation into the forbidden territory of attempt. We answer this question in the affirmative.

By his own testimony, Manley enjoyed only the most casual relationship with Williams, deriving almost entirely from Williams' occasional purchase of a sandwich at Manley's Brooklyn food store. Notwithstanding the insubstantiality of their acquaintance, Manley asserts that on Thursday, April 12, 1979, he received, for the first time, a purely social invitation to visit Williams at home that very night. Manley, who testified to working long and regular hours at his store further claimed to have accepted that week–night invitation, though he had never been to Williams' home before. He claimed that after having closed his store at 10:00 p. m., and after having already returned home and eaten dinner, he drove a considerable distance,

late at night, from his home in Brooklyn to Williams' home in West Hempstead, Long Island, purely for purposes of socializing.

More significantly, Manley brought with him on this social call, a very considerable amount of cash, the nocturnal transportation of which, through a high–crime area of Brooklyn seems most surprising both because it was unnecessary to his visit's reputed purpose and in light of his earlier assertion that he felt Brooklyn to be sufficiently dangerous as to require him to carry a gun. Manley explained that a portion of this money was to be used the following day for legitimate business expenses; however, the jury was fully entitled to reject that partial justification, particularly in light of the fact that the amount of cash Manley was carrying, according to expert testimony, was roughly equivalent to the wholesale purchase price of the quantity of cocaine found on the scale seized in the kitchen. It bears repeating in this connection that Manley was seen running from a room in which cocaine was found lying in the open, both on the scale and on the table. Cocaine is a powdery substance, soluble in liquid and otherwise easily susceptible to spoilage or unintended dispersion, and the jury could thus have properly concluded that at the time the agents made their approach to the house, Manley himself was engaged in its weighing. His attempt to conceal himself does little to bolster his claim of innocence.

Under these circumstances, we decline to reverse the jury's determination that Manley's conduct constituted a "substantial step" towards the actual possession of narcotics. We recognize that this question is always a troublesome one for both judge and jury, and it presents a particularly thorny issue when the offense being attempted is the simple possession of a substance which is easily concealed, rather than mechanically more complex crimes, such as bank robbery, which involve numerous preliminary steps uniquely criminal and generally incompatible with innocent purpose.

Despite the evidentiary difficulties inherent in establishing a criminal attempt to possess narcotics, courts have sustained

verdicts where the evidence might be viewed as less compelling than the instant case. *See United States v. Mandujano, supra* (receipt of $650 from undercover agent in exchange for unfulfilled promise to procure narcotics held a "substantial step"). On review of the proof submitted in the case at bar, we find that the jury was justified in concluding that Manley's conduct was part of an attempt to possess narcotics. Indeed, it is hard to conceive of any additional preliminary steps which he could have taken short of the actual acquisition of the narcotics. In sum, the facts of this case render the likelihood of an unfair conviction minimal.

We have carefully considered the various other claims of error raised by appellants and find them to be without sufficient merit to warrant discussion.

The judgments of conviction are affirmed.