UNITED STATES of America, Appellee,

v.

Sigfredo RIVERA–SOLA, a/k/a Freddy,
Plaintiff, Appellant.

No. 82–1100.

United States Court of Appeals,
First Circuit.

Argued May 3, 1983.

Decided July 27, 1983.

Owen S. Walker, Boston, Mass., for plaintiff, appellant.

Everett M. de Jesus, Asst. U.S. Atty., Hato Rey, P.R., with whom Daniel Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before COFFIN and BOWNES, Circuit Judges, and BONSAL,* Senior District Judge.

BOWNES, Circuit Judge.

Defendant-appellant Sigfredo Rivera-Sola (Rivera) appeals his conviction of two drug-related offenses: (1) attempting to possess approximately 100,000 dosage units of methaqualone (quaaludes), a controlled substance, with intent to distribute them in violation of 21 U.S.C. § 841(a)(1) and § 846; and (2) possessing ten dosage units of quaaludes with intent to distribute them in violation of 21 U.S.C. § 841(a)(1). Rivera claims that there was insufficient evidence to convict him on the first count. Additionally, he argues that errors which occurred during his trial require reversal of both counts one and two. The challenged actions are: (1) the district court's evidentiary ruling allowing evidence of Rivera's other drug offenses to be admitted; (2) the use of a United States Magistrate to preside over the jury selection and to give preliminary instructions to the jury; and (3) the district court's refusal to order a new trial when it was revealed that Rivera's sole witness had acted as an attorney for the ex-wife of one of the jurors. Because we find no merit in any of Rivera's contentions, we affirm his conviction.

## I. The Facts

Since we are reviewing the sufficiency of the evidence, we state the facts in detail. At trial, the government presented four witnesses as well as tapes of meetings and telephone conversations of Rivera, government agents and informants. The testimony and evidence are summarized below.

Beginning in early June 1981, federal agents of the Drug Enforcement Administration (DEA) mounted a "reverse undercover operation" against Rivera, a suspected drug trafficker. In such an operation, a government agent poses as a supplier of drugs; after a sale is made to the targeted buyer he/she is immediately arrested, charged with possession of the drugs, and the purchase money is seized. Here, two government informants, Ramon Tirado and Eduardo Irizarry, arranged an initial meeting between Rivera and undercover DEA agents James Miller and Victor Aponte.

On June 8, Miller and Aponte were introduced to Rivera by Tirado. In the course of conversation, Miller asked Tirado if he had found any customers for his product. Rivera interjected that he was in the business. Miller then stated that he was selling quaaludes. Rivera said that he knew a doctor, a lawyer, and a third person who might be

* Of the Southern District of New York, sitting by designation.

interested in buying quaaludes. When Rivera asked for a sample of ten quaalude tablets, Miller responded that he had 1,000,-000 pills available in Miami, but did not have any samples in Puerto Rico. Miller said that he would arrange for a sample, which Rivera indicated would be given to prospective buyers who would analyze the pills and then place orders. Rivera stated that he estimated that he would make $200,000 on the proposed transaction.

During this meeting, Rivera bragged of his involvement in other large-scale drug transactions, and clearly implied that he had been smuggling narcotics for a number of years. He said that he had previously smuggled ten kilograms of cocaine, some marijuana, and 25,000 quaalude tablets.[1]

After Miller and Aponte left the meeting, Rivera confided to Irizarry his belief that Miller, "the North American man," was a federal agent and that Miller's and Aponte's identities would have to be verified.

The next day Irizarry went to Rivera's office. Rivera said that the transaction proposed by Miller was impossible since he could handle, at the most, 100,000 to 200,000 quaaludes. Two days later, Irizarry and Rivera again met, and Rivera said that he could not act on Miller's offer until he had samples. In two further meetings between Rivera and the government informants, Rivera stressed the need for samples.

Rivera revealed his familiarity with quaaludes by stating at one of the meetings that one quaalude tablet had the effect of five marijuana cigarettes. He also let it be known to the informants that he was considering selling certain farm property to raise the money to buy the 100,000 quaaludes from Miller.

On June 25, agents Miller and Aponte met with Rivera and gave him a sample of ten quaalude pills. Irizarry met Rivera immediately after this meeting and noted that he acted both "nervous" and "desperate." Rivera showed the ten pills to Irizarry and

told him that he would have the pills tested to see if they were genuine. Later that same day, Rivera told Irizarry that one of the sample pills had been tried, and that it was good.

The following day Miller contacted Rivera about placing an actual order for the quaaludes. Rivera had not yet received orders from his customers, but told Miller that everything looked "very, very good." Four days later Miller again telephoned Rivera. Rivera indicated that he had not yet heard from the attorney and another prospective customer, but that he expected more definite information later in the day. He expressed optimism that the drug transaction would go through, and promised to call Miller as soon as he heard from the lawyer. Miller called back later that same day and received no answer.

That same week, Irizarry met with Rivera. At this meeting Rivera indicated that he was dealing with the problem of selling his farm property. He also said that on the following day he and Irizarry might go to Humacao, Puerto Rico, to offer the quaaludes to a friend of Rivera, a doctor.

In early July, 1981, Miller received information that Rivera was suspicious of both him and Aponte. He, therefore, decided not to contact Rivera for a while. On July 20 Miller sent Tirado to speak with Rivera. When Tirado asked Rivera why he was refusing to deal with Miller and Aponte, Rivera responded that "he didn't want to do nothing about anything" and threw Tirado out of his office. This was the final contact between Rivera and the DEA agents and their informants.

## II. The Sufficiency of the Evidence

Rivera argues that the evidence was insufficient to support his conviction for attempted possession of narcotics in violation of 21 U.S.C. § 846. Our standard of review is clear.

---

1. In a previous meeting with Irizarry, Rivera had told of his efforts to land a plane load of marijuana in Humacao, Puerto Rico.

[W]e regard the evidence, including all inferences that may reasonably be drawn therefrom, in the light most favorable to the government. *United States v. Fortes,* 619 F.2d 108, 122 (1st Cir.1980). We must determine whether a reasonable jury, so .viewing the evidence, could find guilt beyond a reasonable doubt. *Id.* The evidence need not exclude every reasonable hypothesis of innocence, *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied* [—— U.S. ——], 103 S.Ct. 738 [74 L.Ed.2d 960] (1983), and if it can support varying reasonable interpretations, the jury is entitled to choose among them, *United States v. Klein,* 522 F.2d 296, 302 (1st Cir.1975).

*United States v. Quejada-Zurique,* 708 F.2d 857 at 859 (1st Cir.1983).

■ There is no general federal statute which proscribes the attempt to commit a criminal offense. Thus, attempt is actionable only where a specific criminal statute outlaws both its actual as well as its attempted violation. *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Here, 21 U.S.C. § 846 makes criminal the attempt to possess narcotics in violation of 21 U.S.C. § 841(a).

■ "Attempt," as used in 21 U.S.C. § 846, is not defined. In fact, nowhere in federal law is there a comprehensive statutory definition of attempt. *United States v. Jackson,* 560 F.2d 112, 116 (2d Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977). When considering an attempt case, the federal courts have rather uniformly adopted the standard found in Section 5.01 of the American Law Institute's Model Penal Code (Proposed Official Draft 1962). This standard provides that the requisite elements of attempt are (1) an intent to engage in criminal conduct; and (2) conduct constituting a "substantial step" towards the commission of the substantive offense which strongly corroborates the defendant's criminal intent. *United States v. Joyce,* 693 F.2d 838, 841 (8th Cir.1982); *United States v. Manley,* 632 F.2d at 987; *United States v. Snell,* 627 F.2d 186, 187

(9th Cir.1980) (per curiam), *cert. denied,* 450 U.S. 957, 101 S.Ct. 1416, 67 L.Ed.2d 382 (1981); *United States v. Monholland,* 607 F.2d 1311, 1318–20 (10th Cir.1979); *United States v. Mandujano,* 499 F.2d 370, 376–77 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975). We also adopt this standard.

■ Mere intention to commit a crime can never amount to an attempt. It is absolutely essential that the defendant, with the intent of committing a particular crime, perform some overt act in furtherance of the criminal scheme. *United States v. Monholland,* 607 F.2d at 1318. Developing a general formulation which adequately describes what constitutes a "substantial step," and at the same time distinguishes such a step from "mere preparation" for a criminal act, has proven to be a "perplexing problem." *United States v. Stallworth,* 543 F.2d 1038, 1039 (2d Cir.1976). The difficulty in pinpointing the "elusive line" which separates "mere preparation" from a "substantial step" is traceable to the supreme importance of the facts in any attempt case. *United States v. Jackson,* 560 F.2d at 113–14. While the "semantical distinction between preparation and attempt is one incapable of being formulated in. a hard and fast rule," *United States v. Noreikis,* 481 F.2d 1177, 1181 (7th Cir.1973), *vacated on other grounds,* 415 U.S. 904, 94 S.Ct. 1398, 39 L.Ed.2d 461 (1974), our analysis is greatly aided by the explanation given by the United States Court of Appeals for the Second Circuit. In *United States v. Manley,* 632 F.2d 978, which also implicated 21 U.S.C. §§ 841(a)(1) and 846, that court stated:

A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime, and thus the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime. In order for behavior to be punishable as an attempt, it need not be incompatible with innocence,

yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute.

As we noted in *United States v. Busic*, 549 F.2d 252, 257 n. 9 (2d Cir.1977), "Judicial inquiry into whether a defendant is chargeable with an attempt is necessarily predictive and focuses on the point when the accused's conduct has progressed sufficiently to minimize the risk of an unfair conviction." ...

Whether conduct represents a substantial step towards the fulfillment of a criminal design is a determination so dependent on the particular factual context of each case that, of necessity, there can be no litmus test to guide the reviewing courts.

*Id.* at 987–88 (citation omitted); *See also United States v. Monholland*, 607 F.2d at 1318–20; *United States v. Oviedo*, 525 F.2d 881, 885–86 (5th Cir.1976).

■ The difficult task of determining whether an attempt has been made is further complicated when, as here, the offense allegedly attempted is simple possession of easily concealed drugs. With a more physical participatory crime, like bank robbery, a defendant must necessarily engage in numerous preliminary steps which brand the enterprise as criminal and are incompatible with innocent purposes. *United States v. Manley*, 632 F.2d at 989. Our review of the evidence, focussing on Rivera's words and actions, convinces us that he intended to purchase illegal drugs and took a "substantial step" towards that end.

First, and most importantly, Rivera repeatedly requested a sample of ten quaaludes which, after being obtained, he had tested. This, standing alone, is incompatible with innocence. Viewed in the context of his past discussions with DEA agents and government informers, it could easily be concluded that Rivera's words and actions relative to the sample pills showed a design to violate 21 U.S.C. § 841(a)(1).

Additional factors support the jury's determination that Rivera took a substantial step towards the commission of the charged offense. These include:

(1) Rivera's statements that he was trying to raise the money to purchase the quaaludes;

(2) Rivera's explanation of his planned distribution scheme to a doctor, a lawyer and a third person;

(3) Rivera's estimation of the profit he would make on the transaction;

(4) Rivera's computation of the number of quaaludes which he could successfully distribute; and

(5) Rivera's numerous meetings and telephone conversations with the DEA agents and government informants. There was ample evidence from which the jury could find that Rivera crossed the line which separates preparation from an attempt.

We place special emphasis on the fact that Rivera's deal did not fall apart until after he had obtained and tested the sample quaaludes. This refutes his argument that the proposed drug transaction never progressed beyond the exploratory stage. His contention that his role in the proposed "buy" was merely that of an intermediary between the sellers (DEA agents) and the potential buyers is beside the point. Rivera attempted to buy drugs with the intention of selling them for a profit—by his own estimate $200,000. This was clearly illegal regardless of the name given to his role in the planned transaction. Nor does the lack of evidence of any order for a specific amount of quaaludes or a set time and place for the sale mean that an attempt was not made by Rivera to purchase illegal drugs. The failure to arrange for the sale means only that the purchase was not consummated, not that there was no attempt to purchase.

Rivera analogizes his situation to that presented in *United States v. Joyce*, 693 F.2d 838, where the United States Court of Appeals for the Eighth Circuit found that no crime had been attempted. In *Joyce*, the defendant, the target of a reverse un-

dercover operation, flew to St. Louis in the hopes of purchasing a pound of cocaine for $20,000. When the seller, an undercover agent, refused to unwrap the purported package of cocaine, the defendant left the hotel room in which the transaction was to occur. As he was exiting, the defendant was arrested and was found to have $22,000 cash in his brief case. Defendant's conviction for attempted possession of cocaine was reversed on appeal.

Because of the fact specific nature of any attempt determination, it is unwise to rely too heavily on other cases from a different court.[2] In any event, *Joyce* is easily distinguishable. As opposed to the limited contact between the defendant and the government agent in *Joyce,* Rivera here engaged in a course of conduct over several weeks which resulted in his acquisition of a sample of ten quaaludes. Further, in *Joyce* the defendant voluntarily withdrew from his planned purchase when the seller refused to exhibit the cocaine. Rivera's purchase, however, was not consummated because of his suspicions that Miller and Aponte were DEA agents. It can reasonably be inferred that if not for this fact, or some similar unforeseen circumstance, Rivera's illegal purchase of 100,000 quaaludes would have been consummated.

## III. *Evidence of Other Crimes*

■ At trial, government witnesses were allowed to recount Rivera's statements that he had been smuggling drugs for years and that he was attempting to land a plane load of marijuana in Puerto Rico. Rivera's attorney objected vigorously, and now maintains that the evidence was improperly admitted to prove Rivera's criminal disposition. *See United States v. Bosch,* 584 F.2d 1113, 1117 (1st Cir.1978).

The admissibility of evidence pertaining to other crimes committed by a defendant is governed by Federal Rule of Evidence 404(b) which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rivera acknowledges that other crimes evidence is relevant to the issue of intent, but argues that his intent was not a genuinely contested issue in this case. We are puzzled by this argument, since in a prior portion of his brief Rivera argues that the evidence presented by the government was insufficient to prove that he intended to purchase 100,000 quaaludes. Ignoring this inconsistency, we note that the evidence fully supports the government's contention that intent—an essential element of any "attempt" crime—was always at issue in this case. In both his opening statement, and while cross-examining the government's witnesses, Rivera's attorney stressed that every conversation about the quaaludes was initiated by the government agents and informants, and never by Rivera. The inference is readily drawn that Rivera's attorney hoped, by his statements and cross-examination, to convince the jury that his client never intended to engage in a drug transaction. We also note that when the other crimes evidence was offered, Rivera's attorney did not object on the ground that intent was not an issue. The attorney objected strenuously, but only on the ground that the other crimes testimony constituted hearsay. We find that the other crimes evidence was relevant on the issue of intent and that its admission complied with Federal Rule of Evidence 404(b).

Having determined that the other crimes evidence was properly admissible to prove intent, we must now engage in the balancing required by Federal Rule of Evidence 403. *United States v. Bosch,* 584 F.2d at 1117. Despite its relevance, the other crimes evidence is only admissible when its probative value outweighs the danger of

2. *See United States v. Mandujano,* 499 F.2d 370 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), for a fact pattern remarkably similar to that presented here, which resulted in affirmance of the defendant's conviction.

unfair prejudice to the defendant. Here, the risk of prejudice was minor. Even excluding the other crimes evidence, the jury could have inferred that Rivera was a seasoned drug dealer from his ability to arrange a large-scale purchase of 100,000 quaaludes. Further, the prejudice was diminished by the court's extensive limiting instruction, given at the time that the other crimes evidence was introduced; the court told the jury that this evidence was to be used solely in evaluating Rivera's intent and state of mind. In the context of this trial, we cannot find that the district court abused its discretion in allowing the jury to consider statements by Rivera that he had been involved in other drug transactions. *See United States v. Herrera-Medina,* 609 F.2d 376, 379 (9th Cir.1979).

IV. *The Selection and Instruction of the Jury by the Magistrate*

Pursuant to judicial authorization, a United States Magistrate presided over the selection of the jury at Rivera's trial. The magistrate then gave the jury a number of preliminary instructions, informing them that counsel's opening statements are not evidence; the government bears the burden of proof; the government must prove Rivera's guilt beyond a reasonable doubt; the defendant is presumed innocent and need not present any evidence or testify; the jury is the sole fact determiner and must make all credibility determinations; and that the jury must follow the court's instructions. At this point a United States District Judge then took over and presided over the remainder of the five-day trial. The judge immediately repeated, in similar terms, many of these preliminary instructions. During the course of the trial, the judge again instructed the jury on all matters which had been covered by the magistrate's instructions. There was only one exception: the judge did not explicitly repeat the magistrate's warning that the jury must follow the court's instructions.

■ Rivera never objected to this use of the magistrate. In fact, at the conclusion of the magistrate's preliminary instructions,

one of Rivera's attorneys thanked the magistrate "for sharing this part of the case." Rivera now alleges that the magistrate's actions were unauthorized and warrant reversal of both of his convictions. Although Rivera waived his right to object, this use of the magistrate, which appears to be a regular practice in the District Court of Puerto Rico, requires comment.

The powers of a United States Magistrate are set out in 28 U.S.C. § 636. Three specific powers and duties are enumerated:

(1) a magistrate may serve as a special master in appropriate civil actions, 28 U.S.C. § 636(b)(2);

(2) a magistrate may hear and determine a large category of pretrial and discovery proceedings in both civil and criminal actions, 28 U.S.C. § 636(b)(1)(A); and

(3) a magistrate may conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommended dispositions to the court, 28 U.S.C. § 636(b)(1)(B).

Magistrates are not limited solely to those duties specifically authorized in 28 U.S.C. § 636(b)(1) and (2). Section 636(b)(3) provides that "[a] magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." This "additional duties" provision is to be broadly construed as authorizing magistrates to perform a wide range of quasi-judicial tasks, as the legislative history of the 1976 amendments to § 636 indicates

[§ 636(B)(3)] enables the district courts to continue innovative experimentations in the use of this judicial officer. At the same time, placing this authorization in an entirely separate subsection emphasizes that it is not restricted in any way by any other specific grant of authority to magistrates.

Under this subsection, the district courts would remain free to experiment in the assignment of other duties to magistrates which may not necessarily be included in the broad category of "pretrial matters". . . .

If the district judges are willing to experiment with the assignment to magistrates of other functions in aid of the business of the courts, there will be increased time available to judges for the careful and unhurried performance of their vital and traditional adjudicatory duties, and a consequent benefit to both efficiency and the quality of justice in the Federal courts.

H.R.Rep. No. 1609, 94th Cong., 2d Sess. 12, *reprinted in* 1976 U.S.Code Cong. & Ad. News 6162, 6172.

Numerous courts have upheld the delegation to magistrates of powers not explicitly mentioned in 28 U.S.C. § 636. In *Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976), the Supreme Court upheld a district court rule which required initial reference to a magistrate of all actions to review administrative determinations regarding the entitlement to Social Security benefits. The court relied heavily upon the legislative history, stating:

"The Magistrate[s] Act specifies these three areas because they came up in our hearings and we thought they were areas in which the district courts might be able to benefit from the magistrate's services. We did not limit the courts to the areas mentioned. Nor did we require that they use magistrates for additional functions at all.

"We hope and think that innovative, imaginative judges who want to clean up their caseload backlog will utilize the U.S. magistrates in these areas and perhaps even come up with new areas to increase the efficiency of their courts." Hearings on the Federal Magistrates Act before Subcommittee No. 4 of the House Committee on the Judiciary, 90th Cong., 2d Sess., 81 (1968).

Section 636(b) was included to "permit ... the U.S. district courts to assign magistrates, as officers of the courts, a variety of functions ... presently performable only by the judges themselves." [S.Rep. No. 371, 90th Cong., 1st Sess., 8, 12 (1967).] In enacting this section and in expanding the criminal jurisdiction conferred upon magistrates, Congress hoped by "increasing the scope of the responsibilities that can be discharged by that office, ... to establish a system capable of increasing the overall efficiency of the Federal judiciary.... " *Id.* at 11.

*Mathews v. Weber,* 423 U.S. at 267–68, 96 S.Ct. at 552–53 (citation omitted); *see also United States v. Saunders,* 641 F.2d 659, 663 (9th Cir.1980) (Supreme Court has allowed magistrates to perform even "inherently judicial" tasks when under supervision of an Article III judge), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981); *In re Establishment Inspection of Gilbert & Bennett Manufacturing Co.,* 589 F.2d 1335, 1340–41 (7th Cir.) (footnote omitted) ("The only limitations on section 636(b)(3) are that the duties be consistent with the Constitution and federal laws and that they not be specifically excluded by section 636(b)(1)."), *cert. denied,* 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979); *United States v. Boswell,* 565 F.2d 1338, 1341–42 (5th Cir.) (because of judge's illness, magistrate presided during four hours of closing argument; reversal of conviction not warranted), *cert. denied,* 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978).

Presiding at the selection of a jury is a recognized "additional duty" of a magistrate. The Legal Manual for United States Magistrates lists as an "additional duty" the "[c]onduct of voir dire and selection of juries for district judges." Administrative Office of the United States Courts, Legal Manual for United States Magistrates, § 3.10(3). Further, the United States District Court for the District of Puerto Rico has a local court rule which provides: "The magistrates are also authorized to: ... [c]onduct voir dire and select petit juries in civil and criminal cases for the Court." D.P.R.R. 13.6N. This use of magistrates has also met with judicial approval. *See Haith v. United States,* 231 F.Supp. 495, 497–99 (E.D.Pa.1964) (neither Fed.R. Crim.P. 24(a) nor due process require presence of trial judge during jury selection; only lawyers present), *aff'd per curiam,* 342 F.2d 159 (3d Cir.1965).

There is no explicit congressional authorization for the use of a magistrate to give preliminary instructions to the jury. Nor do the local court rules for the District of Puerto Rico list this as a specific magistrate duty.

Because Rivera did not object to the role of the magistrate, we review only for plain error. Fed.R.Crim.P. 52(b). Rivera has demonstrated no prejudice from the procedure followed, see United States v. Boswell, 565 F.2d at 1341–42, and we find no error.

We end with a general observation. We think that a magistrate can effectively conduct the voir dire and preside at the selection of juries in civil and criminal cases, thus saving valuable time for our busy district court judges. The trial of criminal cases is, however, entrusted to district judges. Preliminary as well as final jury instructions play an important part in the trial of any case. The jury should not be given the impression that the instructions given it are merely a routine matter of form.

## V. Alleged Juror Bias

Rivera moved for a new trial based on the alleged lack of impartiality of a juror, Rubén Segarra. He pointed to two purportedly prejudicial incidents. First, during the trial, the name Victor Uriel Alvarez was mentioned by Rivera in a taped conversation which was played to the jury. Rivera alleges, without any proof, that this Uriel Alvarez is the brother of juror Segarra's ex-wife. Second, after trial it was discovered that Rivera's sole witness, Jesus Rivera-Arvelo, had filed three contempt motions on behalf of Segarra's ex-wife in a domestic relations proceeding.

■ A district judge may grant a new trial "if required in the interest of justice." Fed.R.Crim.P. 33. Motions for a new trial are directed to the trial court's discretion and this remedy is sparingly used. United States v. Leach, 427 F.2d 1107, 1111 (1st Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 95,

27 L.Ed.2d 59 (1970); see also United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979). In reviewing the district court's denial of Rivera's new trial motion we thus consider only whether the court abused its discretion. United States v. Zannino, 468 F.2d 1299, 1303 (1st Cir.1972), cert. denied, 410 U.S. 954, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973).

■ A defendant seeking a new trial because of nondisclosure by a juror must demonstrate actual prejudice or bias. United States v. Vargas, 606 F.2d 341, 344 (1st Cir.1979).

> "Where an attack is made upon the integrity of the trial by reason of alleged misconduct on the part of a juror in failing to disclose information pertinent to the issue of prejudice, the defendant's burden of proof must be sustained not as a matter of speculation, but as a demonstrable reality."

Id., quoting United States v. Whiting, 538 F.2d 220, 223 (8th Cir.1976) (citations and footnote omitted); see also Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) ("due process does not require a new trial every time a juror has been placed in a potentially compromising situation."). In this case it does not appear that juror Segarra can properly be accused of nondisclosure. Rivera alleges that Segarra was asked, during the voir dire, whether he had ever been involved in a civil or a criminal lawsuit. Segarra answered negatively, not mentioning the domestic relations proceeding brought against him by his ex-wife. The district judge, however, stated that it was doubtful that Segarra had been questioned about any involvement in a civil case; "[i]t is more probable that he was asked if he had been a defendant in a criminal case." [3] A negative answer to this question would not amount to nondisclosure. Also, Segarra cannot be faulted for failing to mention his acquaintance with attorney Rivera-Arvelo during the voir dire.

---

**3.** Transcripts of the voir dire have not been included as part of the record provided to this court.

Not surprisingly, defense counsel did not state at the start of the trial who his witnesses would be. Thus, until Rivera-Arvelo took the stand—the last witness to do so—Segarra would have had no knowledge that his ex-wife's attorney would be a witness in the case.

■ Even assuming wilfull nondisclosure by Segarra, Rivera has offered no evidence demonstrating that he was substantially prejudiced by Segarra's relationship with either Rivera-Arvelo or Uriel Alvarez. Rivera makes no showing that Segarra harbored any animosity toward attorney Rivera-Arvelo. At most, Rivera's allegations demonstrate a casual acquaintance between a defense witness and a juror; a relationship which cannot alone warrant a finding of prejudicial partiality on the part of the juror. *See United States v. Fricks,* 409 F.2d 19, 20–21 (5th Cir.1969) (per curiam); *Carpintero v. United States,* 398 F.2d 488, 490 (1st Cir.1968).

The character of Rivera-Arvelo's testimony on behalf of Rivera further highlights the absence of any substantial prejudice. Rivera-Arvelo was called by the defense in the hopes that his testimony would rebut the inference—raised by the government's witnesses—that Rivera was seeking to sell his farmland so as to raise money to purchase the 100,000 quaaludes. Rivera-Arvelo testified briefly concerning a parcel of land which Rivera owned. He indicated that there were clouds on the title and that Rivera was presently unable to exercise any ownership rights with respect to this land. Rivera-Arvelo also expressed his belief, based on the nonpayment of legal fees due Rivera-Arvelo, that Rivera's financial situation was bleak.

The testimony involved matters only tangentially related to the central question of Rivera's guilt or innocence of the offenses charged. The lawyer's credibility was not put in question, and his testimony was of relatively minor importance and was uncontradicted. Under these circumstances, Rivera's allegation that juror Segarra could not make a rational and detached evaluation of Rivera-Arvelo's testimony amounts to little more than rank speculation.

Similarly, Rivera has demonstrated no prejudice stemming from the mention of Uriel Alvarez' name during trial. This name appeared only once, in an inconsequential part of a taped conversation. Further, there is absolutely no showing that this Uriel Alvarez was juror Segarra's ex-brother-in-law, let alone that there was any animosity between the two men.

Rivera has failed to meet his burden of adducing sufficient evidence to "afford reasonable grounds to question the fairness of the trial or the integrity of the verdict." *Southern Pacific Co. v. Francois,* 411 F.2d 778, 780 (5th Cir.1969) (per curiam) (citation omitted). "[S]omething more than ... an unverified conjecture is required to justify grant of a new trial." *United States v. Barber,* 668 F.2d 778, 787 (4th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982).

*Affirmed.*