UNITED STATES, Appellee,

v.

Mark KARAS, Defendant, Appellant.

No. 90–2103.

United States Court of Appeals,
First Circuit.

Heard July 29, 1991.

Decided Nov. 20, 1991.

Rehearing Denied Feb. 13, 1992.

---

Thomas E. Kanwit with whom Cathryn A. Neaves, Meirwyn I. Walters and Gaston & Snow, Boston, Mass., were on brief for defendant, appellant.

Michael Kendall, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellee.

Before TORRUELLA, Circuit Judge, HILL * and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Defendant-appellant Mark Karas appeals his jury conviction of conspiracy to possess with intent to distribute 100 kilograms of marijuana in violation of 21 U.S.C. § 846. Defendant raises two issues: (1) that evidence was seized in violation of his rights under the Fourth Amendment; and (2) that testimony at trial was improperly admitted against him.

## I. THE SEIZURE

*The Facts*

Defendant brought a pretrial motion to suppress evidence. The evidence introduced at the suppression hearing, held prior to trial, establishes the following facts. On January 27, 1990, defendant arrived at the Tucson, Arizona Airport from Boston, Massachusetts. He proceeded to the baggage claim area to pick up his baggage. Tucson Airport Authority Police Officer

---

* Of the Eleventh Circuit, sitting by designation.

Keith Kramer was on duty at that time. Kramer testified that he was informed by an airline agent that, "there was an individual in the lower level near the baggage area that he was familiar with as being associated with some suspicious activity which had to do with some lost luggage containing some unusual items that ended up in St. Louis." The agent and Kramer went to the baggage claim area where the agent pointed out defendant as the man who had been acting suspiciously. As Kramer observed defendant at the baggage claim area, he paced back and forth and appeared to Kramer to be nervous.

Kramer had considerable experience in law enforcement work and drug investigations. He had served with the airport police for three years and the sheriff's department in Pima County, Arizona for eight years prior to that. He also had attended a police academy for four months. He testified that he had participated in hundreds of drug investigations.

Defendant was twenty-nine years old at the time. He had graduated from college with a B.S. in business management. He gave his occupation as bartender.

While Kramer was watching defendant, another Airport Authority Police Officer, Sergeant Frank Herrera, and a United States Border Patrolman, Chris Richards, were inspecting the baggage from defendant's flight. Herrera had seventeen years experience with the airport police. He had attended Drug Enforcement Agency training programs on surveillance and drug identification and had participated in over 300 drug investigations as an airport police officer.

Richards was in charge of a drug detection dog that was sniffing the baggage as it was unloaded. The dog indicated the presence of narcotics in a red suitcase before it was placed on the baggage carousel for delivery to the baggage claim area. Herrera radioed the dog's reaction to Kramer, but Kramer either did not hear or did not receive the transmission.

Another Airport Police Officer, Officer Price, joined Kramer in the baggage claim area. Both continued to observe the defendant, who was holding a black shoulder bag as he waited at the carousel. Defendant lifted from the carousel the same red suitcase that the drug detection dog had signalled. Because of the failed radio transmission Kramer did not know of the dog's reaction after sniffing the red suitcase.

As defendant started towards the exit, Kramer approached him, said he was interested in an incident that had taken place at another airport, and asked defendant if he could speak to him. Defendant agreed to do so whereupon Kramer asked him for identification. Defendant showed Kramer his Arizona driving license, which Kramer determined was valid. Kramer testified that, at that time, defendant would not have been stopped by either him or Officer Price if he had started to leave. Kramer did not testify, however, that he told defendant he was free to go.

Defendant, according to Kramer, voluntarily said that funny things happen to him at airports and described losing baggage at the airport in St. Louis. This corroborated the information Kramer had received earlier from the airline agent. Kramer then told defendant "the incident I was looking at did involve some unusual circumstances with luggage, and I asked if he could open his suitcase for me." Kramer testified that he told defendant that he had the right to refuse to open his suitcase.

Defendant testified that when Kramer asked him to open his suitcase he did not know that there was marijuana debris in it, and he had no fears or worries that he would get in trouble if he opened it. He, therefore, opened the suitcase at the side of the concourse so that Kramer could see into it. Defendant told Kramer that there was nothing in the suitcase of interest to Kramer. Defendant then fanned through the clothing and blankets inside the suitcase. As he did so, Kramer noticed a small amount of marijuana debris in the suitcase. He asked defendant to leave the suitcase open, which he did.

At this juncture, Sergeant Herrera, Richards and the dog arrived at the baggage claim area. Herrera told Kramer, out of defendant's hearing, that the dog had signalled that the red suitcase contained narcotics. Kramer then asked defendant if the dog could "view" his luggage. Defendant agreed. The dog again signalled that there was narcotics in the red suitcase, and also signalled the presence of narcotics in the black shoulder bag.

Kramer then read defendant the Miranda warnings and told him that if he started to talk he could stop at any time. According to Kramer, defendant agreed to continue talking, stating that he had nothing to hide. Kramer told defendant that he was going to be detained for investigation of possession of narcotics. Defendant was then brought to the airport police office where he read and then signed a "Consent to Search" form.

Kramer then searched and photographed defendant's two pieces of luggage. The red suitcase contained marijuana debris. In the black shoulder bag there were three rubberbanded stacks of United States currency in various denominations totalling about $28,000.

Defendant claimed that he was carrying the money for Andy Chason, a friend in the rock-and-roll recording business who was also in the used car business. Defendant signed an affidavit disclaiming ownership of the money.

The police officers who were involved in the seizure had weapons that were plainly visible. There is no evidence that the police employed force or aggressive tactics.

Defendant's testimony differed from that of the police in several respects. He said that he never felt free to leave after Kramer started questioning him because he was backed against the escalator and could not get out. Defendant testified that after being asked to open his suitcase he inquired, "What if I say no?" and was told that he would be detained until the police got a warrant. Defendant further testified that under the circumstances he felt it would have been fruitless for him to refuse to consent to the search of his luggage.

After hearing the evidence, the district court made the following rulings and findings:

THE COURT: I conclude that I must deny the motion to suppress. In addition to what I have said in the course of our colloquy, giving some indications of my views about the issues, I will make the following additional statements and explanation and findings and conclusions and explanation of my ruling.

First, I find that Officer Kramer had information that had been communicated to him about an unusual occurrence with respect to baggage in the St. Louis airport, that that together with his observations of the defendant Karas in the area of the baggage carousel while awaiting the baggage and while retrieving it from the carousel tended to relate that earlier information to the defendant and at least to his baggage, if not specifically to the red bag, and I think perhaps even specifically to the red bag, and the totality of the circumstances at that point was sufficient to justify what we commonly refer to as a *Terry* stop, an investigative stop for the purpose of simply asking questions and making further inquiry before making any additional decision about what should be done. The form of that stop in this instance was not significantly coercive. It was a request appropriately communicated to which—a request to answer questions appropriately communicated which the defendant consented to, and I find that that was a voluntary consent.

I find also that the request to open the bag was voluntarily agreed to and that the additional information that was observed at that point with respect to what appeared to be marijuana residue gave reason at least for further questioning and then additional information came to Officer Kramer as the other officers approached, still additional information when the dog alerted to the bags.

Now, the one critical question that I haven't addressed in these remarks is the conflict in the testimony with respect to exactly what was said between Kramer and the defendant when Kramer first asked if the defendant would consent to the opening the bag. And the defendant testifies, as I understand his testimony, that at that point the conversation occurred in which he claims that he was told that if he refused consent, he would be detained longer and the baggage search would occur with the benefit of a warrant, because the officer would get the warrant before allowing him to leave with the bag.

Now, even the conversation as related by the defendant is not that specific about both detaining him and detaining the bag, but also bearing in mind all the circumstances and the demeanor of the witnesses before me, I find by a preponderance of the evidence that that conversation did not occur exactly as it has been stated in the defendant's testimony, that very likely there was some conversation in which the defendant asked, "What if I say no?" or words to that effect, but I do not find that any answer was given in which he was told that if he didn't consent he would be detained and a search warrant would be obtained and the baggage would be searched.

Taking into account the totality of the circumstances, I credit the testimony of Officer Kramer as to what occurred and find that the consent given by the defendant to the initial opening of the bag and indeed the opening by him was voluntary, and in addition that the further consent given formally after additional information had been obtained was likewise voluntary, and for those reasons I conclude that I must deny the motion to suppress.

Now, if in these statements of findings and conclusions I have omitted dealing with any matter as to which either of you wishes to make either some request for modification or additional findings, I invite you to tell me so at this time.

MR. KENDALL: No, your Honor.

MR. SULTAN: No, your Honor.

THE COURT: All right.

*The Law*

■ We agree with the district court that Officer Kramer's initial action in ap-

proaching defendant and asking him if he would open his suitcase was an investigative stop authorized under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■ The findings of the district court were fact specific and based on credibility determinations. Because they were neither clearly erroneous nor amounted to an abuse of discretion, we are not free to overrule them, even were we so inclined which we are not. We hold: that defendant was not illegally seized under the Fourth Amendment; that there were articulable facts to ground a reasonable suspicion for an investigative stop; that the search of defendant's luggage was not beyond the scope of the reasonable suspicion of the police officers; and that defendant voluntarily gave consent to search his luggage. We rule, therefore, that the police officers did not illegally seize the defendant or search his belongings in violation of the Fourth Amendment.

## II. THE ADMISSION OF TESTIMONY UNDER FED.R.EVID. 404(b)

*Background*

In order to understand this issue, the evidence adduced at trial must be summarized. Our review of the record is made in the light most favorable to the government. *United States v. Richard,* 943 F.2d 115, 118 (1st Cir.1991); *United States v. Jimenez-Perez,* 869 F.2d 9, 10 (1st Cir. 1989); *United States v. Mejia–Lozano,* 829 F.2d 268, 270 (1st Cir.1987). The government proved through the testimony of witnesses, hotel records, airline tickets, flight schedules, and other evidence that defen-

dant was a courier in a conspiracy whose main purpose and business was transporting marijuana from Tucson, Arizona to Boston, Massachusetts and Providence, Rhode Island area where it was sold. Two of the other couriers involved in the conspiracy, Andrew Chason and Peter Tykulski, testified against defendant as witnesses for the government.

An individual named Tony Logan supplied the marijuana. He ran the operation from his Tucson trailer home. After Tykulski was arrested at Logan Airport in Boston, he agreed to cooperate with the government. Part of his cooperation were several tape-recorded telephone calls to Logan, the supplier, in Tucson. At least one of the phone calls implicated defendant as a member of the marijuana conspiracy. Pursuant to a search warrant, the Arizona State Police searched Logan's trailer in Tucson on January 29, 1990. Seized from the trailer were weapons, a safe, drug paraphernalia, marijuana, airline tickets, and records. Among the records were two handwritten notes; one said, "Pd Mark 1300 and Andy," the other stated, "2600 1300 Mark." Mark is the defendant's first name. Based on our review of the record we can only conclude that, without the testimony at issue, the government proved a very strong case against the defendant.

■ We now turn to the testimony admitted under Fed.R.Evid. 404(b).[1] Tykulski, one of the convicted cooperating witnesses, testified that he flew from Boston to Tucson with defendant in December of 1989. The flight got stranded in either Chicago or Denver and after a few beers, he and defendant had a rather extended conversation. Tykulski had never flown with defendant before and had never talked to him before. The questions and answers containing the 404(b) testimony were as follows:

Q. Could you tell us, what did Mr. Karas say in that plane flight?

---

1. Fed.R.Evid. 404(b) presently states:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

A. He told me that he had been working for another drug dealer in transporting cocaine for him in the United States.

Q. And did he say—did he give you any location reference to this other cocaine transaction?

A. To the—it was in Montana. He mentioned Montana, but other than that—

Tykulski also testified that on the same flight the following conversation took place:

> Well, we talked about smuggling marijuana and he was explaining to me how much easier it was to smuggle cocaine as opposed to marijuana, because you could usually put it on yourself in a duffle bag and go through without having to check it and you never lost sight of the contents.

The government also introduced into evidence, without objection by the defendant, a one-way ticket from Tucson to Missoula, Montana on January 16, 1990, on Delta Airlines and a one-way ticket from Missoula to Tucson on January 17, 1990, on Continental Airlines.

The government had notified defendant prior to trial that this 404(b) testimony would be offered. Defense counsel made the following opening statement to the jury:

> [T]here is going to be evidence in this case that Mr. Karas flew from Tucson to Boston on January 26th, 1990 and flew back from Boston to Tucson the following day carrying with him money, some $27,000 in cash, for Andy Chason. There's no doubt about that. There's no dispute about that.

> \* \* \* \* \* \*

> [W]hile that act, it may turn out, may have actually been helping Chason in whatever drug conspiracy Chason was involved in, that does not constitute sufficient evidence that Mark Karas knowingly conspired to distribute more than 100 kilograms of marijuana.

> \* \* \* \* \* \*

> [A]s you hear the evidence ask yourself that question: "Does this evidence prove

beyond a reasonable doubt that Mr. Karas knowingly agreed to participate in a conspiracy to distribute large quantities of marijuana?"

Defendant did not testify at the trial.

At the bench conference prior to the court's ruling on the admissibility of 404(b) evidence, the prosecutor argued:

> I think it's particularly relevant because Mr. Sultan raised in his opening—and I assume he will continue with it—to question what was Karas' intent of plan, that he admits he was taking money back from Andy Chason for Tony Logan. He just didn't know that drugs were involved. That, your Honor, I think really makes the 404(b) evidence of prime relevance.

This argument was not lost on the district court. It stated:

> I guess I would say that if I hadn't heard in the opening statement that emphasized, the position that intent was really an issue, I would have been inclined to say it's a needless expansion of the evidence in the case, but having that opening statement there, I think I should allow it to come in. The probative weight on the intent question is certainly there and I can't say that it doesn't have significant probative weight when the contentions advanced in the opening statement are taken into account.

There can be no doubt that the court performed the requisite balancing test:

> My conclusion is on the 403 weighing that I should let it it [sic] come in. The probative weight significantly outweighs any risk of unfair prejudice and it is relevant on the knowledge and intent issue. The objection is overruled.

*Analysis*

For the reasons that follow, we find that the district court abused its discretion in allowing Tykulski to testify as to what the defendant had stated about cocaine smuggling.

First, we think it was error for the court to admit the testimony on the ground that defense counsel opened the door by making

knowledge and intent the sole issue. Defense counsel did not explicitly or implicitly state that the defendant lacked knowledge and intent. He first stated that the money (in defendant's bag) "does not constitute sufficient evidence that Mark Karas knowingly conspired to distribute more than 100 kilograms of marijuana." This was argument, pure and simple. The second statement was an argumentative question: "Does this evidence prove beyond a reasonable doubt that Mr. Karas knowingly agreed to participate in a conspiracy to distribute large quantities of marijuana?" This was the issue in the case, precisely the question the jury had to decide. Moreover, neither statement, implied, suggested or inferred that the defense would be that defendant "just didn't know that drugs were involved" as the prosecutor stated in his bench argument, an argument which the district court bought.

 There is more involved here, however, than the interpretation of what defense counsel said in his opening statement. Defendant did not testify. When a defendant chooses not to testify and puts the government to its proof, defense counsel cannot create an issue in its opening statement; she/he can only point what the issues are and the burden of proof required, as was done here. The government in its brief argues that "Karas' trial defense of lack of knowledge and intent made the Rule 404(b) evidence admissible." Government's Brief at 41. But there was no trial defense. Defendant did not testify or put in any evidence, as was his constitutional right. The main issue in any conspiracy case is whether the defendant knew of the conspiracy and, if so, whether he/she intended to join it. *United States v. Benavente Gomez*, 921 F.2d 378, 380–81 (1st Cir.1990). The government had to prove this beyond a reasonable doubt regardless of what defense counsel said in his opening

statement, or if he made no opening. The reasoning of the government, adopted by the district court, means that the 404(b) testimony would have been excluded had defense counsel said nothing in his opening. Where a defendant does not testify or put in evidence, as here,[2] we do not think that statements made by defense counsel in the opening standing alone can be the basis for admitting 404(b) evidence.[3] To base the admission of Tykulski's testimony on the ground that defense counsel raised knowledge and intent as an issue in his opening statement was error.

Second, this was propensity evidence, which is forbidden by the rule: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith...." Fed.R.Evid. 404(b). We assume, for purposes of our analysis, that Tykulski's testimony was true. The relevance of the evidence essentially requires the inference, and rests on the premise, that defendant's trafficking in cocaine makes it more likely than not that he participated in an unrelated marijuana conspiracy. The most that defendant's statements prove is that he was a cocaine trafficker. They do not prove that he committed the crime for which he was indicted and charged: conspiracy to possess with intent to distribute 100 kilograms of marijuana.

 The final issue is whether the admission of the 404(b) testimony was harmless error. Based on our assessment of the record as a whole, we find that it was. The government proved all the elements of the marijuana conspiracy so clearly as to render the error "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Mateos–Sanchez*, 864 F.2d 232, 237 (1st Cir.1988). The 404(b) testimony did not loom large at the

---

**2.** Defense counsel called one witness, Herbert J. Lemon. Lemon, a special agent for the DEA, was the case agent on this case. The questioning focussed on statements made by Chason and Tykulski to Lemon. None of the questions either explicitly or impliedly implicated defendant's knowledge and intent.

**3.** In *United States v. Rivera–Sola*, 713 F.2d 866, 871 (1st Cir.1983), we approved the admission of Rule 404(b) testimony where defense counsel suggested in his opening statement *and* during cross-examination of the government's witnesses that intent was an issue. Our ruling in this case is not contrary to the ruling in *Rivera–Sola*.

trial.· Compared to the evidence that was introduced on the marijuana conspiracy, it was a drop in the bucket. Indeed, it is hard to understand why the 404(b) evidence was introduced at all.

Because we have found the admission of the evidence to be harmless error, there could be no unfair prejudice and Fed. R.Evid. 403 [4] is not implicated.

*Affirmed.*

---

**4.** Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.